**STANDARD FEDERAL BANK, Appellee,**

v.

**STAFF et al., Appellants;  National City Bank et al., Defendants.**

[Cite as *Std. Fed. Bank v. Staff,* 168 Ohio App.3d 14, 2006-Ohio-3601.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–050618.

Decided July 14, 2006.

Larry J. McClatchey, for appellee.

Gregory R. Wilson, for appellants.

MARK P. PAINTER, Judge.

{¶ 1} Does inchoate dower pass to a bankruptcy trustee who settles a fraudulent-transfer issue with the debtor, when the debtor has signed a mortgage (but not the note underlying it) while his bankruptcy remains open in another state—which the debtor has conveniently failed to tell the mortgagee—and then pass back to the debtor when his bankruptcy is closed, thus allowing him to be paid for his dower interest when his wife defaults on the mortgage? Even ahead of the bank?

{¶ 2} We think not. We do not believe the law requires—or should even allow—the proposed result.

## I. The Mortgage

{¶ 3} In December 2001, defendants-appellants Scott and Kimberly Staff signed a $910,000 mortgage for 8050 Kugler Mill Road ("the Kugler property") to plaintiff-appellee Standard Federal Bank's predecessor in interest, ABN AMRO Mortgage Group. (To avoid confusion, we refer to the Staffs by their first names.) In the year preceding this mortgage, Scott (1) had signed a quitclaim deed for his one-half interest in the property to Kimberly, (2) had filed for bankruptcy in Florida, (3) had settled a fraudulent-transfer claim with the bankruptcy trustee on the quitclaim transfer, and (4) had his debt discharged.

{¶ 4} After Kimberly defaulted on the mortgage payments, Standard Federal foreclosed on the property in June 2003. Because Scott's bankruptcy had not been terminated, Scott argues that his dower interest in the property was part of the bankruptcy estate and not subject to transfer. Scott argues that when the bankruptcy case was closed in September 2003, he regained his dower interest in the property. Scott thus claims that he is entitled to an amount equal to the value of his dower interest in the property. And not having relinquished his dower interest, he concludes that he should be paid before the bank collects on its mortgage.

## II. A Fraudulent Transfer?

{¶ 5} On February 5, 2001, Scott filed for bankruptcy protection in Florida. Alan Goldberg served as the trustee in the case until its closure. During September 2001, Goldberg discovered that Scott had quitclaimed his undivided one-half interest in the Kugler property to his wife, Kimberly, in November 2000, three months before petitioning for bankruptcy protection.

{¶ 6} Scott had not disclosed any assets in Ohio when he filed his Florida bankruptcy case. Goldberg decided that despite Scott's conveyance of all his interest in the Kugler property, Scott had continued to reside at the property, make mortgage payments, receive mail, and otherwise act as if the property was his home. Goldberg then moved to have the property appraised as part of Scott's bankruptcy estate.

{¶ 7} Scott and Kimberly negotiated a settlement with Goldberg in which they agreed to pay $105,000 in three installments to satisfy any claims of the bankruptcy estate related to the property. Goldberg then moved to have the court approve the settlement—thereby setting a schedule for Scott's debt repayment. The bankruptcy court approved the compromise on November 15, 2001, and Scott's debt was discharged on December 4, 2001. (But Scott's bankruptcy case was not terminated until September 2003.)

{¶ 8} Eight days later, on December 12, 2001, Kimberly mortgaged the Kugler property for $910,000 to Standard Federal's predecessor in interest, ABN Amro Mortgage Group. While only Kimberly signed the promissory note, both Scott and Kimberly signed the mortgage agreement.

{¶ 9} The terms of the mortgage agreement included the following: "12. Joint and Several Liability; Co-signors; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower that co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to *mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument;* (b) is not personally obligated to pay the

sums secured by the Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or Note without the co-signer's consent." (Emphasis added.)

{¶ 10} In June 2003, Standard Federal filed for foreclosure on the property after Kimberly defaulted on the mortgage payments. Scott's defense to the foreclosure was that he was the "owner of a dower interest, free and clear, in the subject premises." Scott argued that although he was discharged from bankruptcy in November 2001, his bankruptcy case was not closed until September 2003. He contended that his dower interest in the property was part of the bankruptcy estate when he signed the mortgage agreement and thus was not subject to transfer at the time the mortgage was signed.

{¶ 11} Scott argued that his signing of the mortgage before his bankruptcy case was terminated was an attempt to convey an interest in the property that was part of his bankruptcy estate—a violation of the bankruptcy rules. He was thus attempting to profit from his own bad act. He further contended that Standard Federal violated the automatic stay provision of Section 362, Title 11, U.S.Code when it filed the foreclosure complaint against Scott and sought to foreclose on his dower interest while the bankruptcy case was still open. Of course, Standard Federal did not then know about the Florida bankruptcy.

{¶ 12} After Standard Federal added Goldberg as a party to the proceedings, Scott filed a cross-claim against Goldberg. Scott claimed that Goldberg had abandoned his dower interest to him or, in the alternative, that if Goldberg was found to have any interest in the property, it then belonged to Scott after the closing of the bankruptcy case. A default judgment was entered in Scott's favor in July 2004, after Goldberg failed to respond to Scott's cross-claim and motion for default judgment. Of course, Scott's attempted service on Goldberg by certified mail never reached Goldberg because Scott used an incorrect address.

{¶ 13} Standard Federal then moved to have the court set aside the default judgment against Goldberg and moved a second time for summary judgment against the Staffs. The magistrate set aside Scott's default judgment against Goldberg and dismissed all claims against Goldberg. The magistrate then granted Standard Federal's summary-judgment motion. After the parties filed their objections, the trial court adopted the magistrate's decision.

{¶ 14} The Staffs now appeal, arguing that the trial court erred by (1) granting Standard Federal's renewed motion for summary judgment, because Scott did not have title to his dower interest while his bankruptcy case was still pending and thus could not convey his dower interest by signing the mortgage and (2) granting Standard Federal's motion to set aside Scott's default judgment against

Goldberg, because Standard Federal had no standing to seek relief from a default judgment entered against Goldberg.

### III. Summary Judgment

{¶ 15} We review grants of summary judgment de novo, without deference to the trial court's ruling.[1] Summary judgment should be granted only when (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can only come to a conclusion adverse to the nonmoving party, when viewing the evidence in the light most favorable to the nonmoving party.[2] A party moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists, and once it has satisfied its burden, the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial.[3]

### IV. Dower Interests

{¶ 16} A dower interest is an interest in real estate that is intended to protect a non-title-holding spouse. It has been a bane to real estate professionals, lenders, and first-year law students for eons. It is a dour subject.

{¶ 17} But we need to return to the times of lords and fiefs to understand dower interests. In feudal times, land was the chief form of wealth and provided the power base for the head of the family.[4] Thus, the common law created the marital life estate of dower to protect a widow from disinheritance by her husband.[5] Dower provided a lifetime protection for the widow consisting of a one-third interest in the real estate titled to the husband during the marriage.[6] "The extreme subordination of the wife at common law required that some form of protection from disinheritance be given to her upon the death of her husband, for often she was deemed unable or unqualified to venture from the home into a world run almost exclusively by men."[7]

---

1. See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 738 N.E.2d 1243.

2. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

3. See *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264.

4. Dukeminier & Johanson, Wills, Trusts, and Estates (6th Ed.2000) 478.

5. Brashier, Disinheritance and the Modern Family (1994), 45 Case W.Res.L.Rev. 84, 89.

6. Id.

7. Id. at 90, citing Cribbet & Johnson, Principles of the Law of Property (3d Ed.1989) 89.

{¶ 18} In the United States, marital life estates started to be revised during the last half of the 19th century, when states enacted the Married Women's Property Acts, graciously allowing married women to own property.[8]   And beginning in 1930 with the state of New York, common-law states gradually abolished dower and turned to a system based on protecting a spouse's interest in a decedent's entire estate.[9]   In fact, the great majority of states have now abolished dower, as has the Model Probate Code.

{¶ 19} Of course, Ohio is in the tiny minority of states that still recognize dower interests.[10]   In fact, there seem to be only three other states that still recognize dower:  Arkansas,[11] Kentucky,[12] and Michigan.[13]

{¶ 20} In Ohio, a dower interest is described in this way:  "[A] spouse who has not relinquished or been barred from it shall be endowed of an estate for life in one-third of the real property of which the consort was seized as an estate of inheritance at any time during the marriage." [14]   In other words, either spouse is entitled to a one-third dower interest in real property unless it has been relinquished or barred.

{¶ 21} Under this doctrine, whenever a married person buys real estate in Ohio, the married person's spouse automatically receives a dower interest.  Thus any document that intends to convey or mortgage an interest in the property is not effective as to the non-title-holding spouse's dower interest unless that spouse has also signed the document.

{¶ 22} Dower has always existed in Ohio.  Ohio has not abolished it as unnecessary, probably for the reason the rest of the "Revised" Code mainly remains unchanged—inertia.  The present language—including the eccentric word "consort" for spouse—has remained unchanged for at least 107 years.[15] Dower can create odd situations, as in the following case:

---

8.   Id. at 93, citing Haskins, Curtesy in the United States (1951), 100 U.Pa.L.Rev. 196, 197, and Chused, Married Women's Property Law:  1800–1850 (1983), 71 Geo.L.J. 1359, 1393–95.

9.   Id.

10.   Dukeminier & Johanson, Wills, Trusts, and Estates (6th Ed.2000) 478–479.

11.   Ark.Code Ann. 28–11–301.

12.   Ky.Rev.Stat.Ann. 392.020.

13.   Mich.Comp.Laws 558.01.

14.   R.C. 2103.02.

15.   *Brown v. Kerns* (1899), 9 Ohio Dec. 112, 6 Ohio N.P. 68;  *Dillman v. Warner* (1935), 54 Ohio App. 170, 7 O.O. 492, 6 N.E.2d 757.

{¶ 23} "The plaintiff alleges that she was married to Harry Hickok in 1832, that he died in 1866, that during their coverture he was seized of an estate of inheritance in the lands described in the petition, that the defendant is now seized of the lands, and prays for the assignment of her dower therein. The defendant admits that the facts stated in the petition are true; but he alleges in bar of the plaintiff's claim, that in 1851 she obtained a decree of divorce from the said Hickok, whereby the bonds of matrimony existing between them were dissolved, and that, afterwards, she married one Denison Lamkin, who died before the said Hickok, whereby she became the widow of the said Lamkin, and is not the widow of the said Hickok. He further avers that after the divorce, the said Hickok married another wife, who survives him, and is now his widow." [16]

{¶ 24} At least here, we have the intersection of only dower and bankruptcy.

### V.  A Novel Argument, i.e., Fit for a Novel

{¶ 25} The Staffs' first assignment of error challenges the trial court grant of summary judgment to Standard Federal. The Staffs maintain that Scott did not have title to his dower interest before his bankruptcy case was terminated and, therefore, could not convey his dower interest when he signed the mortgage. The Staffs instead believe that Scott's dower interest in the property became a part of his bankruptcy estate and could not be conveyed without the approval of the bankruptcy court. Then when the bankruptcy was closed, Scott reacquired the dower interest. Of course, Scott tried to convey it anyway when he signed the mortgage, but he now asserts that his signature was ineffective because, unbeknownst to the mortgagee, he was in bankruptcy.

{¶ 26} In rebuttal, Standard Federal argues that (1) Goldberg's settlement with Kimberly and Scott concerning the Kugler property before the Standard Federal loan closing enabled Scott to grant a valid and enforceable mortgage; (2) even if Scott's dower interest was not his until it was "abandoned" to him after the bankruptcy case terminated, the effect of that "abandonment" under federal bankruptcy law was to restore Standard Federal and Scott to their respective rights as if the bankruptcy case had never been filed, thus retroactively ratifying Scott's prior conveyance to Standard Federal; (3) Scott was barred from contending that his conveyance to Standard Federal was ineffective at the time of the loan closing by Ohio's Doctrine of After–Acquired Property; and (4) Scott was equitably estopped by his concealment of his pending bankruptcy from denying the enforceability of his conveyance to Standard Federal.

---

16. *Lamkin v. Knapp* (1870), 20 Ohio St. 454.

### VI. Bankruptcy

{¶ 27} Commencing a bankruptcy case creates an estate comprised of all the debtor's legal or equitable interests in property as of the date the petition in bankruptcy is filed.[17]

{¶ 28} The federal bankruptcy courts in both the southern and northern districts of Ohio have previously held that inchoate dower is a recognizable interest in real estate.[18]  Also, when the spouse alleged to have an inchoate dower is the debtor, the dower interest becomes the property of the estate.[19]

{¶ 29} Thus, it is well settled in Ohio that a dower interest can be measured and included in a bankruptcy estate.[20]  In the present case, since Scott had not relinquished his dower interest and had not been barred from exercising it, his dower interest became a part of his bankruptcy estate at the time he filed for bankruptcy protection.

{¶ 30} The issue before us now is what happened to Scott's dower interest after it entered his bankruptcy estate.  And what happened when he came out of bankruptcy.

### VII. Automatic Stays for Property in Bankruptcy Estate

{¶ 31} Under Section 362(a)(3), Title 11, U.S.Code, "any act to obtain possession of property * * * from the estate or to exercise control over property of the estate" is automatically stayed by the bankruptcy filing.  Thus, for Standard Federal to attempt to foreclose and repossess the property that Scott maintained a dower interest in, it would have needed to petition for relief from the automatic stay or the property would have to have been abandoned from the bankruptcy estate.  Section 362(d), Title 11, U.S.Code states, "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest."

{¶ 32} Standard Federal could have petitioned the bankruptcy court for relief from the automatic stay.  But Standard Federal did not attempt to do so—mainly

---

17.  Section 541(a)(1), Title 11, U.S.Code.

18.  See *In re Lambert* (Bankr.N.D.Ohio 1986), 57 B.R. 710, 712, citing *In re Conrad* (Bankr. N.D.Ohio 1981), 12 B.R. 32; *In re Featherstone* (Bankr.S.D.Ohio 1980), 8 B.R. 321, 322–323. See, also, H.Rep. No. 595, 95th Cong., 1st Sess. (1977).

19.  *Lambert,* 57 B.R. at 713.

20.  Id.

because it did not know that Scott had filed for bankruptcy in Florida. Scott had concealed that detail—and signed the mortgage anyway.

## VIII. Abandoned Property

{¶ 33} So the issue becomes whether Scott's dower interest was abandoned by the bankruptcy estate. Standard Federal maintains that when Scott and Kimberly negotiated a settlement with Goldberg whereby they agreed to pay $105,000 in three installments to satisfy any claims of the bankruptcy estate related to the Kugler property on November 15, 2001, Scott's dower interest was released back to him. Standard Federal thus believes that when Scott cosigned the mortgage document 27 days later, he was able to convey his dower interest. Scott instead contends that he did not have title to his dower interest before his bankruptcy case was terminated and, therefore, could not convey his dower interest when he executed the mortgage agreement.

{¶ 34} Under Section 554, Title 11, U.S.Code, the bankruptcy-estate property is abandoned under the following circumstances: "(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate. (b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate. (c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." In this case, Scott's dower interest in the property was abandoned at the close of the case under Section 554(c), Title 11, U.S.Code, because a settlement was reached whereby the Staffs paid $105,000 to satisfy any claims against the Kugler property, and because the dower interest in the property was not otherwise administered.

{¶ 35} The effect of abandonment by a trustee under Sections 554(a), (b), or (c), Title 11, U.S.Code, "is to divest the trustee of control over the property because once abandoned, property is no longer part of the bankruptcy estate. * * * When property is abandoned, it ceases to be property of the estate and reverts to the debtor."[21] Thus, when property is abandoned under Section 554(a), (b), or (c), Title 11, U.S.Code, it is removed from the estate, the trustee is divested of control, and the jurisdiction of the bankruptcy court ceases over

---

21. See *In re Sills* (Bankr.S.D.Ohio 1991), 126 B.R. 974, 976, citing *Brown v. O'Keefe* (1937), 300 U.S. 598, 602, 57 S.Ct. 543, 81 L.Ed. 827; see, also, *In re Dewsnup* (C.A.10, 1990), 908 F.2d 588, 590.

matters concerning the abandoned property.[22]   Once a trustee abandons property of the estate, the property is treated as though no bankruptcy had been filed, and interest in the property reverts to the party that held such interest pre-petition.[23] Normally this party is the debtor,[24] but a creditor may be entitled to possession instead if, under applicable law or by exercise of contractual or other rights, it held a superior possessory interest at the time the bankruptcy petition was filed.[25]

■ {¶ 36} In this case, it does not matter whether we accept Standard Federal's argument that Scott's dower interest was released upon his settlement with Goldberg of the claims against the property, or Scott's argument that his dower interest was abandoned to him upon the termination of the bankruptcy proceedings—the result is the same.  Once Scott's bankruptcy case was terminated, Scott's dower interest reverted to him as if no bankruptcy had ever been filed. His conveyance of the dower rights through signing the mortgage thus became effective with the close of the bankruptcy case.

{¶ 37} The Staffs' first assignment of error is overruled.

## IX.   Setting Aside Default Judgments

{¶ 38} The Staffs' second assignment of error argues that the trial court erred in granting Standard Federal's motion to set aside Scott's default judgment against Goldberg, the bankruptcy trustee.  The Staffs argue that Standard Federal had no standing to seek relief from the default judgment because (1) it was not a party to the default judgment and (2) Goldberg did not join in the motion to vacate the default judgment.  Not so.

■ {¶ 39} The issue is whether the trial court abused its discretion when it granted Standard Federal's Civ.R. 60(B) motion to set aside the default judgment.  An abuse of discretion connotes an attitude by the court that is unreasonable, unconscionable, or arbitrary.[26]  "Unreasonable" means that no sound reasoning supports the decision.[27]

---

**22.** See *In re Keller* (Bankr.S.D.Ohio 1998), 229 B.R. 900, 902.

**23.** *Brown*, 300 U.S. at 602, 57 S.Ct. 543, 81 L.Ed. 827;  *Matter of Popp* (Bankr.D.Neb.1993), 166 B.R. 697, 700.

**24.** See *Farm Credit Servs. of Mid–America, ACA v. Dues* (1995), 104 Ohio App.3d 760, 765, 663 N.E.2d 379.

**25.** See *In re Bell* (C.A.6, 1983), 700 F.2d 1053, 1057–1058, *In re A.J. Lane & Co., Inc.* (Bankr.D.Mass.1991), 133 B.R. 264, 268–269.

**26.** See *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 498, 506, 589 N.E.2d 24.

**27.** See *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597;  *State v. Echols* (1998), 128 Ohio App.3d 677, 700, 716 N.E.2d 728.

{¶ 40} Under Civ.R. 60(B), a court may relieve a party from a final judgment, order, or proceeding for a number of reasons: "(1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(B); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the judgment." The rule further provides that a motion should be made within a reasonable time—and for reasons (1), (2), and (3), it should not be more than one year after the judgment, order, or proceeding was entered.[28]

{¶ 41} Thus, a party seeking relief from a default judgment under Civ.R. 60(B) must show (1) a meritorious defense, (2) entitlement to relief under one of the grounds set forth in the rule, and (3) that the motion is made within a reasonable time.[29]

{¶ 42} In this case, the Staffs argue that Standard Federal could not seek relief from Scott's successful motion for a default judgment against Goldberg. The Staffs cite our decision in *Zanders v. Jones*[30] for the proposition that Standard Federal did not have standing to move to set aside the default judgment.

{¶ 43} In that case, Zanders was injured in an automobile accident caused by Jones.[31] Zanders sued and unsuccessfully attempted to serve the complaint on Jones through certified mail and publication. Zanders then notified Jones's insurance carrier, State Farm, and included the complaint and police accident report. Zanders also moved and was granted a default judgment against Jones for $15,000. For six and one-half years, State Farm denied that it insured Jones. After State Farm finally acknowledged that it insured Jones, Zanders filed a supplemental complaint naming State Farm as a party and demanding payment of the judgment against Jones. State Farm answered the complaint and filed a Civ.R. 60(B) motion requesting relief from Zanders's judgment against Jones. The trial court overruled State Farm's motion.

---

28. Civ.R. 60(B).

29. See *GTE Automatic Elec. v. ARC Industries* (1976), 47 Ohio St.2d 146, 150–151, 1 O.O.3d 86, 351 N.E.2d 113.

30. See *Zanders v. Jones* (Dec. 29, 1993), 1st Dist. No. C–920961, 1993 WL 539021.

31. Id.

{¶ 44} We affirmed the trial court's decision on the ground that State Farm had no standing because it was neither a "party" against whom the judgment was entered nor a "legal representative" empowered to seek relief on behalf of the party.[32] We agreed with the Second Appellate District's decision in *Augaitis v. Reichard*[33] that when "an insurance carrier named in a supplemental complaint seeks relief from a default judgment entered against the insured, the insurer is not a party to the default judgment and, therefore, has no standing within the contemplation of Civ.R. 60(B) unless its insured also joins in the motion."[34]

{¶ 45} This case is distinguishable from *Zanders*. The *Zanders* case was about an insurance carrier, who was not an original party to the lawsuit, who concealed its relationship with the insured for six and one-half years, only to then file a Civ.R. 60(B) motion after a supplemental complaint had been filed against it. Here, Standard Federal was the plaintiff in the lawsuit against the Staffs and moved within a month after the default judgment had been entered against a cross-defendant for the judgment to be set aside. And while Scott purportedly served the complaint on Goldberg at his regular place of business, Goldberg provided the court with an affidavit showing that he had never done business at the address Scott used.

{¶ 46} We agree with the Second Appellate District that a postjudgment intervenor such as Standard Federal may file a motion for relief from a previously entered judgment under Civ.R. 60(B).[35]

{¶ 47} In the present case, Standard Federal sought relief from a default judgment under Civ.R. 60(B) and met all three necessary elements. Standard Federal demonstrated (1) a meritorious defense—its property interest in the unpaid mortgage and Scott's attempt to establish his dower interest in the property; (2) entitlement to relief under one of the grounds set forth in the rule—Civ.R. 60(B)(5), the catch-all provision that reflects the inherent power of the court to relieve a person or entity from an unjust operation of a judgment;[36] and (3) that the motion was made within a reasonable time—in this case, only one month after the default judgment was entered.[37]

---

32. Id.

33. See *Augaitis v. Reichard* (June 28, 1993), 2nd Dist. No. 13693, 1993 WL 239579.

34. See *Zanders*, 1st Dist. No. C–920961, 1993 WL 539021.

35. See *ABN AMRO Mtge. Group, Inc. v. Jackson*, 159 Ohio App.3d 551, 2005-Ohio-297, 824 N.E.2d 600, at ¶ 14.

36. See *Caruso–Ciresi, Inc. v. Lohman* (1983), 5 Ohio St.3d 64, 5 OBR 120, 448 N.E.2d 1365, paragraph two of the syllabus.

37. *GTE Automatic Elec.*, 47 Ohio St.2d 146, 150–151, 1 O.O.3d 86, 351 N.E.2d 113.

{¶ 48} While we note that the grounds for invoking Civ.R. 60(B)(5) should be substantial,[38] the egregious circumstances of this case warranted the trial court's decision to set aside the default judgment. Scott's motion for a default judgment against Goldberg was a backhanded attempt to reestablish his dower interest in his marital residence after (1) executing a quitclaim deed to avoid including the Kugler property in his bankruptcy estate and then (2) signing a $900,000 mortgage days after the bankruptcy court had discharged his debt. Such deceit should not be sanctioned by the court.

{¶ 49} The trial court did not abuse its discretion in setting aside Scott's default judgment against Goldberg—we cannot conceive that it should not have done so. The Staffs' second assignment of error is overruled.

### X. The Trial Court Was Right

{¶ 50} We hold that the trial court was correct that (1) Scott's signing of the mortgage gave up his dower interest when the mortgage was foreclosed and (2) setting aside the default judgment was just. We affirm the trial court's grant of summary judgment to Standard Federal.

Judgment affirmed.

GORMAN, P.J., and SUNDERMANN, J., concur.

---

38. *Caruso–Ciresi, Inc.*, 5 Ohio St.3d 64, 66, 5 OBR 120, 448 N.E.2d 1365, citing Staff Note to Civ.R. 60(B); *Adomeit v. Baltimore* (1974), 39 Ohio App.2d 97, 105, 68 O.O.2d 251, 316 N.E.2d 469.