**SFJV 2005, L.L.C., Appellee,**

v.

**REAM et al., Appellants.**

[Cite as *SFJV 2005, L.L.C. v. Ream*, 187 Ohio App.3d 715, 2010-Ohio-1615.]

Court of Appeals of Ohio,
Second District, Champaign County.

Nos. 2009 CA 7, 2009 CA 27.

Decided April 9, 2010.

Amelia A. Bower and David Van Slyke, for appellee.

Andrew M. Engel, for appellants Miami Valley Hospital and Mercy Memorial Hospital.

FROELICH, Judge.

{¶ 1} Miami Valley Hospital and Mercy Medical Center (collectively, "the hospitals") appeal from two judgments of the Champaign County Court of Common Pleas in a foreclosure action by SFJV 2005, L.L.C. ("SFJV") concerning real property owned by Paul and Donna Ream. The hospitals claim that the trial court erred in granting judgment to SFJV entering a decree of foreclosure and confirming the sale of the property. For the following reasons, the trial court's judgments are affirmed.

I

{¶ 2} The evidence at trial established the following facts.

{¶ 3} In July 2000, Paul and Donna Ream entered into a land contract with Richard and Marilyn Freyhof for the purchase of the property located at 471 Gwynne Street in Urbana, Champaign County, Ohio. In April 2004, the Reams completed the land contract and received a survivorship deed (in both their

names) for the property. To finance the purchase, Donna Ream obtained a loan from and gave a note to American Mortgage Service Company ("AMSC") in the amount of $64,705. Due to Paul Ream's financial and employment situation, he was not included on the note. The accompanying mortgage identified Donna Ream as the mortgagor/borrower. However, at closing, Paul Ream initialed each page and signed the signature page as a "borrower" below his wife's signature.

{¶ 4} Within 30 days of closing, AMSC indorsed the note to Washington Mutual Bank FA. Washington Mutual subsequently indorsed the note twice—to Secretary of the Department of Housing and Urban Development ("HUD") and to SFJV. HUD also indorsed the note to SFJV.

{¶ 5} The mortgage was held by Mortgage Electronic Registrations Systems, Inc. ("MERS"), as nominee for AMSC. In December 2005, MERS assigned the mortgage to HUD. A couple of months later, HUD assigned the mortgage to SFJV 2004–1, L.L.C., which, in May 2007, assigned the mortgage to SFJV. Wells Fargo Bank, N.A., a successor by merger to Wells Fargo Home Mortgage, executed the assignment of mortgage from SFJV 2004–1, L.L.C., to SFJV pursuant to a limited power of attorney from SFJV 2004–1, L.L.C., to Wells Fargo Bank.

{¶ 6} SFJV entered into a servicing agreement with EMC Mortgage SFJV 2005 ("EMC"), whereby EMC was authorized to service mortgages on SFJV's behalf. In accordance with that servicing agreement, EMC appointed Wells Fargo Bank as the subservicer of the mortgage.

{¶ 7} In 2005, Donna Ream defaulted on her loan, and a foreclosure action was filed. In October 2006, Wells Fargo Bank, doing business as America's Servicing Company, entered into a loan-modification agreement with Donna Ream. As part of the agreement, the principal balance was modified to $67,695.45. The foreclosure action was dismissed.

{¶ 8} Donna Ream again defaulted on her loan. As a result, in May 2007, SFJV filed a complaint for foreclosure and reformation of mortgage. Miami Valley Hospital was named as a defendant due to a judgment lien obtained by the hospital against the Reams in September 2005. Mercy Memorial Hospital was subsequently added, with leave of court, due to a judgment lien obtained by that hospital against the Reams in August 2005.

{¶ 9} SFJV filed an amended complaint in December 2007. In that complaint, SFJV sought an equitable lien, a constructive trust, and a resulting trust as to Paul Ream's one-half interest in the property. It also sought reformation of the mortgage to fully secure Paul Ream's interest in the property. SFJV requested that it be granted judgment on the note against Donna Ream, that it be found to

have first lien priority (subject to any lien by the county treasurer), and that the property be foreclosed and sold.

{¶ 10} A trial on the matter was held on October 22, 2008, during which evidence was presented as to whether Paul Ream had mortgaged his interest in the property, whether SFJV was the real party in interest, and the balance due on the note.

{¶ 11} On January 21, 2009, the trial court found that Donna Ream had signed a note secured by a mortgage in favor of SFJV's predecessor in interest and that SFJV was the holder of the note. The balance on the note had been modified pursuant to a loan-modification agreement signed by Donna Ream and America's Servicing Company. The court further found that the balance due under the note, as modified, was $67,400.32, plus interest at a rate of 6.5 percent per annum from January 1, 2007, plus court costs, advances, and other charges as allowed by law. The court ordered judgment in favor of SFJV and against Donna Ream in that amount.

{¶ 12} With respect to the mortgage, the court found that the mortgage signed by Donna and Paul Ream "secures the entire property, not just the interest held by Defendant Donna Ream." Thus, the court found "that the mortgage is valid on its face and that, by signing and initialing the mortgage, Defendants Donna and Paul Ream: (a) mortgaged, granted, and conveyed their interest in the respective property; (b) covenanted that they were lawfully seised of the estate; and (c) accepted and agreed to the terms and covenants contained in the body of the mortgage." The court found that SFJV's claims for reformation and equitable relief were moot. The court ordered SFJV to submit a proposed decree of foreclosure for review by the court.

{¶ 13} On February 9, 2009, the court entered a judgment and decree in foreclosure, and it ordered the property to be sold. On February 27, 2009, SFJV filed a praecipe for order of sale for 471 Gwynne Street. An order of sale was issued on the same date. The house was appraised to be worth $25,000, and the sheriff's sale was scheduled for April 24, 2009. Kelly Shank of the Urbana Daily Citizen, a daily newspaper published in Urbana, filed an affidavit stating that a notice of the sheriff's sale (which was attached to the affidavit) was published "three consecutive weeks and next after March 24, 2009."

{¶ 14} On April 24, 2009, the sheriff sold the property to SFJV for $38,000. The sheriff's return of the writ of execution was filed three days later. On June 17, 2009, the trial court confirmed the sale of the property, directed that the property be conveyed to SFJV, and ordered distribution of the proceeds of the sale to the appropriate parties. The order confirming the sale consisted of a proposed entry by SFJV's counsel with handwritten modifications by the trial judge.

{¶ 15} The hospitals appeal from the judgment and decree of foreclosure and the confirmation of sale.

## II

{¶ 16} In case No. 09–CA–07, the hospitals appeal from the trial court's judgment and decree in foreclosure, raising three assignments of error. We will address the assignments in an order that facilitates our analysis.

### A. Interpretation of the Mortgage Document

{¶ 17} The hospitals' first and third assignments of error state:

{¶ 18} "The trial court erred in holding as a matter of law that, on its face, the mortgage encumbered the entire property."

{¶ 19} "The trial court's judgment is against the manifest weight of the evidence."

{¶ 20} In their first assignment of error, the hospitals claim that the trial court erred in finding that the mortgage signed by the Reams was clear and unambiguous. They argue that the mortgage is ambiguous and that Paul Ream could have signed the mortgage in order to release his dower right to the property. The hospitals thus argue that the trial court erred in finding, as a matter of law, that Paul Ream had mortgaged his interest in the property. The hospitals observe that the trial court had previously concluded that it could not rule, as a matter of law, on SFJV's reformation claim.

{¶ 21} The hospitals' third assignment of error argues that to the extent the trial court did consider the evidence adduced at trial in concluding that the mortgage attached to Paul Ream's interest in the property, the court's judgment is against the manifest weight of the evidence.

{¶ 22} We review the mortgage under general principles of contract law. "Courts presume that the intent of the parties to a contract resides in the language they have chosen to employ in the agreement." *Fountain Skin Care v. Hernandez*, 175 Ohio App.3d 93, 2008-Ohio-489, 885 N.E.2d 286, ¶ 22, citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519. "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271. Under such circumstances, a court may not go beyond the plain language of the agreement to determine the parties' rights and obligations, and it may not consider parole evidence of the parties' intentions. *Fountain Skin Care* at ¶ 22; *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St.3d 306, 2007-Ohio-4917,

875 N.E.2d 31, ¶ 7. Instead, the court must give effect to the express terms of the contract. Id.

{¶ 23} In contrast, "if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." *Inland Refuse Transfer Co.* at 322, 15 OBR 448, 474 N.E.2d 271. "If an ambiguity exists in a contract, then it is proper for a court to consider 'extrinsic evidence,' i.e., evidence outside the four corners of the contract, in determining the parties' intent. *Blosser v. Carter* (1990), 67 Ohio App.3d 215, 219, 586 N.E.2d 253. Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement. Id." *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.* (1998), 129 Ohio App.3d 45, 55–56, 716 N.E.2d 1201; *GZK, Inc. v. Schumaker Ltd. Partnership,* Montgomery App. No. 19764, 2003-Ohio-5842, 2003 WL 22461779, ¶ 20.

{¶ 24} We review the trial court's interpretation of a contract de novo. *Ignazio v. Clear Channel Broadcasting, Inc.,* 113 Ohio St.3d 276, 2007-Ohio-1947, 865 N.E.2d 18, ¶ 19.

{¶ 25} According to SFJV's Exhibit 1, on April 12, 2004, Donna Ream and Paul Ream each signed the open-end mortgage. Page 1 states that the mortgagor is "Donna Ream, a married person," who was thereafter referred to as the "borrower." The security interest was given to MERS, as nominee for the lender, AMSC. The mortgage secured Donna's repayment of a debt of $64,705, as evidenced by a note, with the property located at 471 Gwynne Street in Urbana, Champaign County, Ohio.

{¶ 26} Both Paul and Donna Ream initialed each page of the mortgage and both signed the last page as "borrower." Although not discussed by the parties, paragraph 12 of the mortgage addresses cosigners. It provides:

{¶ 27} "The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations

with regard to the terms of this Security Instrument or the Note without that Borrower's consent."

{¶ 28} The mortgage includes additional terms relating to payment of the principal and interest on the debt, insurance and residency requirements, condemnation, subordination of other liens, grounds for acceleration of the debt, reinstatement, and waiver, among others.

{¶ 29} The hospitals assert that the mortgage is ambiguous because Paul Ream is not listed as a "Borrower" on the first page of the security instrument. They claim that "because Paul could have been signing merely to release his dower rights, his intent cannot be gleaned from the face of the mortgage." [1]

{¶ 30} The trial court's January 21, 2009, decision does not indicate whether the court found the mortgage unambiguous as a matter of law or, instead, concluded after considering the evidence that Paul Ream had mortgaged his interest in the property. Regardless, we find nothing ambiguous about the mortgage. The first page states that Donna Ream, the borrower, owes the lender a debt of approximately $64,000, which was evidenced by a note due and payable on May 1, 2034. These statements are followed by terms that provide that the "borrower" mortgages the property located at 471 Gwynne Street in Urbana as security for repayment of that debt. Paul initialed each page of the mortgage and signed the signature page on a line labeled "borrower."

{¶ 31} Although Paul Ream is not listed as a borrower/mortgagor on the first page of the mortgage, paragraph 12 of the mortgage makes clear that a "borrower" who signs the mortgage instrument but does not execute the note mortgages his interest in the property without assuming liability for repayment of the debt; Paul signed as a "borrower." There is no mention in the mortgage about the release of dower rights, nor is there any provision that suggests that Paul Ream signed the mortgage for a purpose other than to mortgage his interest in this property.

---

1. "A dower interest is an interest in real estate that is intended to protect a non-title-holding spouse." *Standard Fed. Bank v. Staff*, 168 Ohio App.3d 14, 2006-Ohio-3601, 857 N.E.2d 1245, ¶ 16. In Ohio, dower interests are codified in R.C. 2103.02. That statute provides: "[A] spouse who has not relinquished or been barred from it shall be endowed of an estate for life in one-third of the real property of which the consort was seized as an estate of inheritance at any time during the marriage." Thus, under R.C. 2103.02, whenever a married person buys real property in Ohio, the person's spouse automatically receives a dower interest, and "any document that intends to convey or mortgage an interest in the property is not effective as to the non-title-holding spouse's dower interest unless that spouse has also signed the document." *Staff* at ¶ 21. Ohio is one of approximately four states that continue to recognize dower interests.

{¶ 32} Even if we were to conclude that the mortgage was ambiguous, the trial court had ample evidence to support its conclusion that Paul Ream had mortgaged his interest in 471 Gwynne Street.

{¶ 33} "[T]he civil manifest-weight-of-the-evidence standard was explained in *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus ('Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence'). We have also recognized when reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct. * * * This presumption arises because the trial judge [or finder-of-fact] had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' * * * 'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.' " *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, quoting *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80–81, 10 OBR 408, 461 N.E.2d 1273.

{¶ 34} Theresa Hurley of Ohio Real Estate Title, who conducted the closing on the Reams' purchase of the property, testified that Paul Ream was on the deed with Donna Ream but was not a borrower on the note. Hurley stated that Paul was originally expected to release his dower interest at closing, but that did not occur, because Paul was placed on the deed, giving him a fee interest in the property. Hurley stated that "we had him sign as spouse to mortgage his half interest." Hurley indicated that she would not have allowed the transaction to close if Paul were not signing to mortgage his half interest in the property. She stated: "I need to fully secure my lender who was in a serious position. And without his signature and without him signing the mortgage to mortgage his half interest, then my lender is not secure." Hurley testified that it is "very common to not have a non-borrowing spouse in the agreeing clause."

{¶ 35} Cindy Banks–Mattachione, the mortgage banker for AMSC who originated the 2004 loan for Donna Ream, also testified that it is common for a person who is not the primary obligor on a debt not to have his or her name on first page of the mortgage. Banks–Mattachione did not know why that was case, but she indicated that it was "typical in this industry" not to have the nonobligor's name on the first page. Banks–Mattachione stated that it was AMSC's intention that it be fully secured with first-lien priority. She testified that she reviewed the

Reams' mortgage after it was signed at closing and that AMSC did not "have a problem with the execution of the documents."

{¶ 36} Based upon the evidence at trial, the trial court could have reasonably concluded that Paul Ream signed the mortgage for the purpose of mortgaging his interest in 471 Gwynne Street. The trial court's conclusion was not against the manifest weight of the evidence.

{¶ 37} The first and third assignments of error are overruled.

## B. *Evidentiary Issues*

{¶ 38} The hospitals' second assignment of error states:

{¶ 39} "The trial court erred in admitting certain evidence at trial."

{¶ 40} In their second assignment of error, the hospitals claim that the trial court erred in admitting several of SFJV's documentary exhibits and a portion of a witness's testimony at trial.

{¶ 41} SFJV offered the testimony of Tamara Savery, a litigation processor for Wells Fargo Bank N.A., to establish the chain of ownership of the Reams' mortgage and of the note signed by Donna Ream. After discussing numerous exhibits—including assignments of mortgage, servicing agreements, the loan-modification agreement, and the report of use of a fictitious name—the hospitals made a general objection to Savery's testimony regarding these exhibits. Counsel stated:

{¶ 42} "I apologize. It try—I really don't want to object to everything. What the witness is doing is testifying to some documents. There has been no foundation laid for these documents. Well, as far as foundation for admissibility, of course, the only things she is doing is reading the documents. There's been no sense to me she knows anything about transactions described in the documents. So I would move to strike all of her testimony with regard to these documents, until at least there has been enough foundation to admit them."

{¶ 43} The court overruled the objection. Counsel for SFJV responded:

{¶ 44} "Thank you, Judge. We would submit that these are documents of a public agency and that they would qualify on their own self-authentication under the rules of evidence, without regard to this witness laying the foundation. But I appreciate the Court's ruling here."

{¶ 45} At the conclusion of the trial, the hospitals objected to the admission of several of SFJV's exhibits. They argued that Exhibits 2 through 5 were inadmissible because SFJV did not provide certified copies and no one had authenticated any of the signatures on those documents. They objected to Exhibits 8 through 10 on the ground that those exhibits were not certified copies.

The hospitals objected to Exhibit 11, the servicing agreement, arguing that there was no foundation that the document was executed. They objected to Exhibit 12, a subservicing agreement, because that document was dated prior to Exhibit 11 yet the testimony was that the subservicing agreement was made in furtherance of the servicing agreement. They objected to the loan-history documents, Exhibit 15, arguing that there was no foundation that the documents were business records. The hospitals objected to Exhibit 16 because counsel had no recollection of that exhibit's being discussed. Finally, the hospitals objected to Exhibit 23, a letter from HUD, for lack of foundation, stating that the letter was not on HUD letterhead and was unsigned. The hospitals reassert these objections on appeal.

{¶ 46} "Proving the contents of a writing presents problems with hearsay, authentication, and the best evidence rule." *State v. Carter* (2000), Ross App. No. 99 CA 2479, 2000 WL 1466189. Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by him as an assertion. Evid.R. 801(A). "Evid.R. 802 mandates the exclusion of hearsay unless any exceptions apply." *In re Lane,* Washington App. No. 02CA61, 2003-Ohio-3755, 2003 WL 21652176, at ¶ 11. The relevant exceptions to the hearsay rule include business records, public records, and records of documents affecting an interest in property. Evid.R. 803(6), (8), (14).

{¶ 47} Documents must be authenticated or identified prior to their admission into evidence. Evid.R. 901. This requirement is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Id. Extrinsic evidence of authenticity is not required for certain documents to be admitted. Evid.R. 902. For example, certified copies of public records, commercial paper, and acknowledged documents are self-authenticating. Evid.R. 902(4), (8), and (9).

{¶ 48} We note that SFJV's binder of exhibits consists of photocopies of various records. "Duplicates" are admissible "to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances, it would be unfair to admit the duplicate in lieu of the original." Evid.R. 1003. Evid.R. 1001(4) defines a "duplicate" as "a counterpart produced * * * by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, * * * or by other equivalent techniques which accurately reproduce the original." Upon review of exhibits and the trial transcript, we find no basis to conclude that the original documents

were required.  Accordingly, we will review the exhibits/duplicates as if they were the originals.

{¶ 49} First, the hospitals assert that the trial court erred in admitting Exhibits 2 through 5.  Exhibits 2, 3, and 5 are assignment-of-mortgage documents, and Exhibit 4 is a limited power of attorney; each of these documents was recorded in Champaign County.  The hospitals assert that these documents are inadmissible hearsay because SFJV failed to offer certified copies at trial, as required by Evid.R. 902(4), in order to authenticate the documents.  SFJV responds that the documents were properly admitted under Evid.R. 902(8), because they are all acknowledged by a notary.

{¶ 50} Exhibits 2 through 5 each bear a stamp indicating the date and time that the documents were recorded in Champaign County, and there is a notation of the book and page in which the document was recorded.  As assignments of mortgage, Exhibits 2 through 5 constitute documents affecting an interest in property, and, accordingly, they are exempted from the hearsay rule under Evid.R. 803(14).  Moreover, each of the exhibits has a page consisting of an acknowledgment by a notary.  "Documents acknowledged by [a notary] are self-authenticating."  *Lorain Cty. Bar Assn. v. Kennedy* (2002), 95 Ohio St.3d 116, 766 N.E.2d 151;  Evid.R. 902(8).  The trial court did not err in admitting Exhibits 2 through 5.

{¶ 51} Next, the hospitals assert that the trial court erred in admitting Exhibits 8, 9, and 10, which are three documents filed with the Ohio secretary of state—report of use of fictitious name, certificate of amendment to foreign corporation application for license, and a document indicating that Wells Fargo Home Mortgage, Inc. had been merged out of existence.  Exhibits 8 through 10 are public records and, thus, are admissible under an exception to the hearsay rule.  Evid.R. 803(8).  Furthermore, the documents include a certificate by the secretary of state's office that it has custody of these specific business records and that the business records show the recording and filing of these documents;  the certification is signed by the Ohio secretary of state and includes the seal of the office of the secretary of state.  This certification is sufficient to meet the self-authentication requirements of Evid.R. 902.

{¶ 52} The hospitals object to Exhibit 11, the unsigned servicing agreement between SFJV and EMC Mortgage SFJV 2005, L.L.C., giving EMC the right to service mortgages on SFJV's behalf, and Exhibit 12, the subservicing agreement whereby Wells Fargo Bank agreed to perform as the subservicer of the mortgage.  Both of the exhibits are unsigned, and the hospitals argue that SFJV "offered no proper evidence that [Exhibit 11] had ever been signed."  The

hospitals further argue that, because the admission of Exhibit 12 is premised on the admission of Exhibit 11, Exhibit 12 should not have been admitted.

{¶ 53} During her direct examination, Savery was asked several questions about the terms of Exhibits 11 and 12. On cross-examination, the hospitals' counsel asked her if the servicing agreement, Exhibit 11, was signed by anyone. Savery responded: "This particular copy is not, but we did bring a signed copy. I believe we have the signed copy." It is unclear whether a signed copy was actually produced, but based on Savery's testimony, the trial court could have reasonably concluded that Exhibit 11 accurately reflected the terms of the executed servicing agreement. The trial court did not abuse its discretion in admitting Exhibits 11 and 12.

{¶ 54} Next, the hospitals object to the trial court's admission of Exhibit 15, computer screen printouts of Donna Ream's loan history. Savery testified that as part of her duties with Wells Fargo Bank, she reviews loan files and loan documents owned by the bank. With regard to this case, she stated that she had reviewed and become familiar with the loan file of Donna Ream. Savery was asked to identify Exhibit 15, as follows:

{¶ 55} "Q: Okay, Now, I'd like to refer your attention to what's in your notebook as Exhibit O, but that is now Plaintiff's Exhibit 15. Do you see that?

{¶ 56} "A: Yes.

{¶ 57} "Q: And can you tell the Court what that is?

{¶ 58} "A. That's the loan history. A mortgage loan history from our system.

{¶ 59} "Q: Okay. And it's broken down into a number of screens. Are those screen prints from your computer?

{¶ 60} "A: They are."

{¶ 61} Although Savery did not expressly testify that the loan history was maintained in the regular course of business, the trial court could have reasonably concluded that the loan history printouts were business records maintained by Wells Fargo Bank regarding Donna Ream's loan. The court did not abuse its discretion in admitting Exhibit 15.

{¶ 62} The Hospitals challenged the admission of Exhibit 16, which merely states: "Exhibit P TBA." SFJV concedes that "Exhibit 16 appears to be an irrelevant document, having not been introduced in the proceeding. It was evidently inadvertently admitted as an exhibit." We agree that Exhibit 16 is nonsubstantive and irrelevant, and we find its admission to be harmless.

{¶ 63} The hospitals further assert that the court should not have admitted Exhibit 23, a letter from HUD to Washington Mutual. This document merely

substantiates other exhibits which demonstrate how Donna Ream's loan was serviced. Assuming, arguendo, that the letter should not have been admitted, its admission was harmless.

■ {¶ 64} Finally, the hospitals assert that the trial court erred in allowing Savery to testify to the balance due on the note. During her testimony, Savery stated that the principal balance due on the loan, as of that date, was $67,400.32. The hospitals objected, which prompted the following exchange:

{¶ 65} "[Counsel for the hospitals]: Your Honor, I would object. I believe the witness is looking at something that hasn't been introduced or hasn't been marked as an exhibit. She was fiddling with papers. I really can't tell. I don't believe she's referring to Exhibit [15], though.

{¶ 66} "[Counsel for SFJV]: We would be happy to – I think this witness brought paperwork from the file with her today. Your Honor, we're happy to share that with counsel. I'll mark it as an exhibit.

{¶ 67} "[Counsel for the hospitals]: Well, Your Honor. I did ask some time ago for all the trial exhibits. And I thought I had them. And then we got some more last week. And now they are offering new ones.

{¶ 68} "[Counsel for SFJV]: With all due respect, Your Honor, this is a document that is created to picture the account today. It didn't exist on the day prior to today.

{¶ 69} "THE COURT: Witness can testify about the claimed mortgage balance due now. And Defense can cross-examine as to that and to the source of that ruling."

{¶ 70} Savery then testified that the amount of interest due, calculated through October 24, 2008, was $7,942.95. In addition, the account had advances of $2,212.31 that had not been reimbursed, as well as late charges. Donna Ream would also have to pay a recording fee.

{¶ 71} On cross-examination, counsel for the hospitals asked Savery what documents she was reviewing when she gave the balance due under the note. Savery responded, "[I am] referring to the printout that I brought from the payoff screen from our system, calculated through tomorrow's date." Counsel for the hospitals was provided an opportunity to examine the documents. Savery also noted that Exhibit 17, a letter from the law firm of Lerner, Sampson and Rothfuss, was also a payoff document.

{¶ 72} Exhibit 17, which was admitted without objection, reflected the payoff amounts stated by Savery in her testimony. Moreover, counsel for the hospitals was provided an opportunity to review the documents that Savery had relied upon in testifying to the payoff amount of Donna Ream's loan. We find no

reversible error in the court's decision to allow Savery's testimony regarding the balance due on the note.

{¶ 73} The hospitals' second assignment of error is overruled.

## III

{¶ 74} In case No. 09–CA–27, the hospitals appeal from the trial court's confirmation of sale of the Reams' property. Their sole assignment of error states:

{¶ 75} "The trial court erred in confirming the sheriff's sale of the foreclosed property."

{¶ 76} The hospitals' assignment of error raises two issues: (1) whether the party seeking the order of confirmation must file a motion in accordance with Civ.R. 7(B) and (2) whether the trial court may confirm the sheriff's sale more than 30 days after the date of sale.

{¶ 77} Beginning with the hospitals' contention that SFJV should have filed a motion with the court requesting an order confirming the sale, the hospitals claim that they were never given an opportunity to object to the confirmation of sale. They assert that SFJV's failure to comply with Civ.R. 7(B), which requires applications to the court for an order to be made by motion, "deprived [them] of the opportunity to protect their interest in the sales proceeds." They state: "Had they received notice of the confirmation, they could have moved the Court to hold sufficient funds on deposit to satisfy their judgment amounts from the sales proceeds."

{¶ 78} The trial court's distribution of the sale proceeds in the order confirming the sale was consistent with its prior judgment of foreclosure, which established the priority of lienholders, and the hospitals do not raise any defects in the procedures used to effectuate the sale of the property. In light of our affirmance of the judgment of foreclosure in 09–CA–7, the hospitals were not prejudiced by SFJV's failure to seek a confirmation order by motion. We decline to reverse the trial court's confirmation of sale on this basis.

{¶ 79} The hospitals further claim that the trial court's confirmation of sale was untimely. R.C. 2329.31(A) requires the trial court, upon return of the writ of execution, to examine the sale proceedings and, if the sale was conducted according to law, to direct the clerk of court to make an appropriate entry and the attorney who filed the writ of execution to give the purchaser the deed. Effective September 11, 2008, such directions must be given within 30 days of the return of the writ. R.C. 2329.31(A). However, the court may stay the confirmation of the sale to permit a property owner time to redeem the property or for

any other reason that it determines is appropriate. Id. When a stay is issued, the court must confirm the sale within 30 days after the termination of any stay. Id.

{¶ 80} In this case, the trial court confirmed the sale on June 16, 2009, approximately seven weeks after the sheriff's return of the writ of execution. Although the trial court did not meet the statutory 30-day deadline and did not enter a stay of proceedings, we find that no prejudicial error has occurred.

{¶ 81} The assignment of error is overruled.

### IV

{¶ 82} The often Byzantine and even obfuscatory practices of the mortgage industry added a layer of complexity to this case not necessary to resolve the legal issues presented. Having overruled each of the assignments of error, we affirm the judgment of foreclosure and the judgment confirming the sale of the Reams' property.

Judgment affirmed.

BROGAN and FAIN, JJ., concur.