[Cite as *State v. Quarles*, 2015-Ohio-3050.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

STATE OF OHIO                                    :
                                                 :
    Plaintiff-Appellee                   :    C.A. CASE NO.   2014 CA 72
                                                 :
v.                                               :    T.C. NO. 13CR455
                                                 :
ANTHONY QUARLES                                  :    (Criminal Appeal from
                                                 :     Common Pleas Court)
    Defendant-Appellant                  :
                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___31st___ day of ____July____, 2015.

. . . . . . . . . .

RYAN A. SAUNDERS, Atty. Reg. No. 0091678, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

HILARY LERMAN, Atty. Reg. No. 0029975, 249 Wyoming Street, Dayton, Ohio 45409
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} After a jury trial in the Clark County Court of Common Pleas, Anthony Quarles was convicted of failure to comply with the order or signal of a police officer, in violation of R.C. 2921.331, a third-degree felony.   The trial court sentenced Quarles to three years in prison, ordered him to pay restitution, and suspended his driver's license

for 10 years.

{¶ 2} Quarles appeals from his conviction, claiming that his conviction was against the manifest weight of the evidence, that the trial court abused its discretion concerning the admissibility of several pieces of evidence, and that the trial court erred in allowing the prosecutor to state his reasons for an objection in front of the jury. For the following reasons, the trial court's judgment will be reversed and the matter will be remanded for further proceedings.

### I. Manifest Weight of the Evidence

{¶ 3} Quarles's first assignment of error claims that his conviction was against the manifest weight of the evidence.

{¶ 4} A weight-of-the-evidence argument "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 5} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175.

{¶ 6} At trial, the State presented the testimony of Paul Herald and Jennifer Scott, both police officers for the City of Springfield. Their testimony established the following facts.

{¶ 7} At approximately 3:52 a.m. on May 2, 2013, Officer Herald was in a marked cruiser in the area of Lexington Avenue and South Belmont, a residential area with a speed limit of 35 mph. The officer heard a vehicle accelerating rapidly toward the intersection (the vehicle "sounded like a loud muffler"), and he observed a vehicle run the stop sign at the intersection. Herald described the vehicle as a teal, four-door, four-wheel-drive, 1995 Chevy Tahoe. Officer Herald got behind the Tahoe, accelerated, activated his overhead lights, and attempted to make a traffic stop. The Tahoe was travelling "well over 45 or 50 miles per hour" and did not stop. Herald pursued the vehicle. Officer Herald was able to relay the license plate number for the vehicle, and the dispatcher determined that the registered owner was Laura Cline.

{¶ 8} Near the beginning of the chase, the Tahoe's driver turned on the interior dome light and reached into the center console. Herald saw that the driver was a male wearing a black t-shirt. Herald broadcasted the Tahoe's speed and direction to other

officers, who came to assist him. Officer Herald and the Tahoe made "several circles in this area," and Herald continued to relay traffic conditions and other information over his radio. Officer Scott notified Herald that she would attempt to deploy stop sticks at the intersection of Harrison and East. As Officer Herald approached that intersection, he observed that Officer Scott failed to deploy the stop sticks, and he and the Tahoe continued through the intersection.

{¶ 9} Eventually, the Tahoe, followed by Officer Herald's cruiser, turned into a dead-end street. Officer Scott and Sgt. Hopper pulled in behind Herald. The Tahoe turned around in a grassy area and drove toward the officers; the headlights of Herald's cruiser and the cruiser's spotlight shone on the Tahoe. When the driver was 20 to 30 feet away, Herald could see the driver's face and that the driver's left arm, which was hanging out the window, had "a large amount of tattoos." The Tahoe drove between Scott's and Hopper's vehicles, nearly striking them.

{¶ 10} The chase continued, and the Tahoe accelerated to over 60 mph. Another officer deployed stop sticks. The stop sticks were unsuccessful at stopping the Tahoe, but the cruisers of two other officers who were backing up Herald were disabled. Soon after, Officer Herald was told to terminate the pursuit, and he pulled over. An Ohio State Trooper who was assisting in the pursuit indicated that he would attempt to get permission to continue.

{¶ 11} The Tahoe was later located, abandoned, within several blocks of where the pursuit terminated. Inside the vehicle were photo booth-type photos, which Officer Herald recognized as being of the driver. The vehicle also contained Clark County court documents, which Officer Herald described as "like yellow copies of an affidavit, like the

defendant's copy that they get served during arrest, and some other court papers." The document had the name Anthony Wayne Jackson Quarles and a Social Security number.

{¶ 12} Officer Herald looked up Quarles's name and social security number in the law enforcement computer system and saw book-in photos of Quarles; the book-in photos included photos of Quarles's face, profile, and tattoos on his arms and back. Herald testified that, after looking at the book-in photos, he recognized Quarles as the driver and that the tattoos on Quarles's left arm were consistent with those that Herald had observed on the driver.

{¶ 13} At trial, Officer Herald identified Quarles as the driver of the Tahoe. Quarles was asked to display his left arm during Officer Herald's testimony, and Herald was asked if he could confirm that those were the same tattoos. Herald responded, "It looks like there is some new work, but yes, very consistent with what I saw."

{¶ 14} Officer Scott testified at trial that she saw the driver for "a split second." She stated that Quarles's face was "consistent in appearance" to the driver's, but she could not positively identify Quarles as the driver.

{¶ 15} Officer Herald did not ask for the car to be tested for fingerprints. He explained that it is often difficult to distinguish fingerprints when multiple people might use the vehicle. Herald also indicated that he did not collect the court documents and photographs from the car; they remained in the Tahoe when the vehicle was towed by the police. (Quarles did not make a Crim.R. 29 motion at the conclusion of the State's case.)

{¶ 16} Quarles testified on his own behalf. He stated that he was in Berthoud, Colorado on May 2, 2013, working for his aunt, Stephany Simpson. Quarles stated that he did landscaping, landscape architecture work, and tree removal. As for May 2

specifically, Quarles stated that he worked on removing an enormous oak tree at the back of a house; the tree was cracked down the middle, and its trunk had a rotted cavity. Quarles stated that he remembered it, because he found the tree "spooky." Quarles testified that the tree removal took two days, and he worked six hours each day. Quarles stated that he drove to Colorado on April 3, 2013, stayed with Simpson while he was there, and returned to Springfield on June 6, 2013.

{¶ 17} Quarles testified that he signed two documents as part of his work for Simpson. The first document was "a contract for a 1099," saying that Quarles was paying his own taxes. The second was a timesheet showing how much he had worked.

{¶ 18} With respect to his relationship to the owner of the car, Quarles testified that Laura Cline was the mother of a former girlfriend. He stated that the photograph of him that was found in the car was taken in Pennsylvania around Christmastime 2012, and the court paperwork concerned a ticket he had received in October 2012. Quarles testified that he had last driven the Tahoe (together with Cline's daughter and her children) on October 27, 2012, when he had received a traffic citation for driving on a suspended license, and that he had been driving his own Chevy Silverado in May 2013. Quarles stated that he stopped seeing Cline's daughter in June or July 2013.

{¶ 19} Quarles denied that he was involved in a high-speed chase in Springfield, Ohio, on May 2, 2013, and he reiterated that he was in Berthoud, Colorado on that date. Quarles further testified that he knows several people with tattoo "sleeves", saying "nowadays tattoos are so common, everybody has them. Very common."

{¶ 20} On cross-examination, Quarles acknowledged that he does not have a valid driver's license and did not when he was driving his Silverado. He also stated,

without objection, that he did not file taxes last year and works "under the table now."

{¶ 21} Officer Herald testified again, as a rebuttal witness, that Quarles could not have been in Colorado on May 2 at 3:52 a.m., because he (Herald) was "positive that that is the gentleman that was driving that car." The prosecutor showed Herald copies of court papers for the October 27, 2012 traffic citation, over Quarles's objection. Herald testified that the documents in the Tahoe included court papers, not just the traffic citation, and that the court papers for the October 27, 2012 citation would have been given to Quarles after that date. The prosecutor also showed Herald, over Quarles's objection, court documents related to a February 2, 2013 traffic offense; Herald again testified that, if Quarles had not been in the Tahoe after October 27, 2012, those court papers could not have been in the Tahoe. On cross-examination, Herald acknowledged that he had only looked at the name on the court papers in the Tahoe, and that the documents presented in court were not the actual documents located in the vehicle.

{¶ 22} On appeal, Quarles claims that his conviction was against the manifest weight of the evidence, because Officer Herald's eyewitness identification was unreliable, there was no fingerprint evidence to support the identification, and there was evidence that Quarles was in Colorado at the time of the offense.

{¶ 23} "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. * * * Like any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15. Here, the State provided the eyewitness testimony of Officer Herald, who testified that the Tahoe's driver was illuminated by Herald's cruiser's headlights and spotlight after the Tahoe turned around

on the dead-end street. Herald stated that he saw the driver's face, as well as the driver's left arm, which was hanging out the Tahoe's window throughout the chase and had a large number of tattoos. The Tahoe was located shortly after the chase, and at that time, Herald was able to identify Quarles as the driver by searching the computer system for his name and Social Security number, as provided by the court documents found in the vehicle.

{¶ 24} Moreover, the State provided evidence that Quarles was associated with the Tahoe; it belonged to his then-girlfriend's mother, was primarily used by the girlfriend, and Quarles had driven that vehicle in the past. Court documents and photographs of Quarles were found within the vehicle. This evidence, in conjunction with Officer's Herald's identification, provided substantial evidence that Quarles was the driver during the pursuit.

{¶ 25} Quarles presented evidence that he was in Colorado working as an arborist for his aunt on May 2, 2013. Quarles described documents that substantiated his claim (the documents themselves were not admitted into evidence), but there was evidence that Quarles had no government documents, such as tax records, to substantiate that employment. The credibility of the witnesses and the weight to be given to their testimony were matters for the jury, as the trier of fact, to determine. Considering all of the evidence admitted at trial, the jury did not lose its way when it determined, from the totality of the evidence, that Quarles was the driver of the Tahoe.

{¶ 26} The first assignment of error is overruled.

## II. Admissibility of Defendant's Documentary Exhibits

{¶ 27} In his second assignment of error, Quarles claims, in part, that the trial

court abused its discretion when it excluded documents proffered by him at trial.

**{¶ 28}** Quarles testified that he had received two documents relating to his work for Simpson. Immediately before defense counsel showed the exhibits to Quarles during his testimony, the prosecutor objected, in the jury's presence (as opposed to a sidebar discussion), stating:

[PROSECUTOR]: Your Honor, I object to both of these documents. This is hearsay within hearsay. Under Evidentiary Rule 802, it cannot be admitted under business records, exceptionally [sic] because the custodian of it is not here to testify.

And moreover, that exception does not apply to the facts that indicate there is a lack of trustworthiness. In the present case the alleged party is actually the defendant's aunt. She has no business address, owns her apartment. She told authorities she had no records before.

We can – continued this trial twice to give her an opportunity to appear. She has not done so. The documents had been altered by adding dates of employment; and again, our initial two trial dates, September 14th and October 8th, this document was never produced until after those trial dates. Therefore, the lack of trustworthiness, these documents cannot be introduced.

[DEFENSE COUNSEL]: Your Honor, these – they were given him in the normal course of business, in her business. It's got her gardening, independent contractor agreement. It's got his signature. So surely, he can authenticate something that he actually signed on the spreadsheet.

It was given to him so that he would know the amounts that were paid. She happened to put the dates on it. It's got the date on there. It's got his name at the top.

And as far as her attendance, shortly after a discussion, we believe that she was scared in – based on how she does her business with tax purposes. She was afraid to attend because she didn't want to incriminate herself on how she conducts her own business. But that has no bearing on whether he was there or not.

THE COURT: Can I see the document?

[PROSECUTOR]: Your Honor, may I approach?

THE COURT: I just want to see the documents.

(Judge reading.)

THE COURT: You're okay to the admissibility [sic] of the document?

[THE PROSECUTOR]: In the absence of this person to come in and testify, yes, there is no way for this to come in.

THE COURT: Are you offering these exhibits in at this time?

[DEFENSE COUNSEL]: Yes. I was going to show him.

THE COURT: You can show him the documents. As far as admissibility, I'll reserve ruling on that unless or until somebody can authenticate the document.

{¶ 29} After the documents were marked, defense counsel asked Quarles about the documents. Quarles identified Exhibit 1 as "the contract stating that I pay for my own taxes and * * * of the equipment that I borrowed from her." Quarles stated that the document had both his and his aunt's signatures and his Social Security number, and that

he was present when the document was signed. Quarles stated that the first set of signatures were made while they were in Simpson's office in her home in the downstairs of her house. The second set of signatures at the bottom were made later, after Quarles turned in Simpson's equipment.

{¶ 30} Quarles testified that Exhibit 3 was the same contract that was signed. He stated that the "only thing that was added to it was the dates that was written on here from the work order, and that's the only difference." A time-stamp appears at the top.

{¶ 31} Finally, Quarles identified Exhibit 2 as "the days marked for the work order of a workbook, the days that I worked. It's on the books for 1099 purposes."

{¶ 32} At the conclusion of the defense case, defense counsel offered into evidence Exhibits 1, 2, and 3, as well as State's Exhibit E, a letter from Simpson (the aunt) that the prosecutor had used for impeachment. The State objected on hearsay grounds. The trial court agreed and asked defense counsel if there was a particular exception that applied. Counsel responded that Quarles authenticated the documents, that he was a party to the contract with his aunt, and that the information was coming "just as much from him as it is from her. It was their mutual agreement." The prosecutor responded that Simpson had created and provided the documents to Quarles. The court sustained the State's objection, finding that the business record exception to the hearsay rule did not apply.

{¶ 33} " 'Proving the contents of a writing presents problems with hearsay, authentication, and the best evidence rule.' " *SFJV v. Ream*, 187 Ohio App.3d 715, 2010-Ohio-1615, 933 N.E.2d 819, ¶ 46 (2d Dist.), quoting *State v. Carter*, 4th Dist. Ross No. 99 CA 2479, 2000 WL 1466189 (Sept. 26, 2000).

{¶ 34} Authentication is governed by Evid.R. 901. "Evid.R. 901(A) requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be." *State v. Simmons*, 2d Dist. Montgomery No. 24009, 2011-Ohio-2068, ¶ 12. The threshold standard for authenticating evidence is low, *State v. Wiley*, 2d Dist. Darke No. 2011 CA 8, 2012-Ohio-512, ¶ 11, and Evid.R. 901(B) provides examples of numerous ways that the authentication requirement may be satisfied. The most commonly used method is testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1). *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 30.

{¶ 35} For purposes of Evid.R. 901, Quarles authenticated Exhibits 1, 2, and 3 during his direct examination, when he identified the documents as documents prepared by Simpson for purposes of his employment as an independent contractor for her. Quarles authenticated the signatures at the top of the contract (Exhibits 1 and 3), stating that he and his aunt had signed the contract at her house at the same time. Quarles indicated that the signature on the bottom was his, and the signature was made when he returned Simpson's equipment.

{¶ 36} An authenticated document may be inadmissible if its contents violate the hearsay rules. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). In general, hearsay is not admissible. Evid.R. 802. However, there are several exceptions to the hearsay rule.

{¶ 37} In Ohio, a business record is admissible as competent evidence "if the custodian or the person who made such record * * * testifies to its identity and the mode of

its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission." R.C. 2317.40; *see also* Evid.R. 803(6) (providing exception to hearsay rule for records of regularly conducted activity).

{¶ 38} The business records exception has its own authentication requirement that must be met before the rule applies. *Ohio Receivables, L.L.C. v. Williams*, 2d Dist. Montgomery No. 25427, 2013-Ohio-960, ¶ 14. "A witness authenticating a business record must be sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance and retrieval that he or she can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Evid.R. 803(6)." *State v. Jackson*, 2d Dist. Montgomery No. 24430, 2012-Ohio-2335, ¶ 74. "Generally, the business record exception requires that some person testify as to the regularity and reliability of the business activity involved in the creation of the record." *Ohio Receivables* at ¶ 14.

{¶ 39} In addition, we note that, to prove the content of a writing, the best evidence rule requires introduction of the original writing. Evid.R. 1002. A duplicate is admissible to the same extent as the original, unless a genuine question exists as to the authenticity of the original or, under the circumstances, it would be unfair to admit the duplicate. Evid.R. 1003. Other evidence of the document's contents may be introduced upon proof that "[a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." Evid.R. 1004(1).

{¶ 40} Quarles was not required to comply with the business record exception, Evid.R. 803(6), to introduce Exhibit 1, the contract between Simpson and him. The document itself was not hearsay; it was the best evidence of the existence of a contract between Simpson and Quarles. *See JLJ Inc. v. Rankin & Sourser, Inc.*, 2d Dist. Montgomery No. 23685, 2010-Ohio-3912, ¶ 41. Having been properly authenticated by Quarles under Evid.R. 901, the trial court erred in failing to admit Exhibit 1.

{¶ 41} However, Quarles could not authenticate Exhibit 2, the monthly time cards for April, May and June 2013, for purposes of Evid.R. 803(6). Exhibit 2 reflected the days that Quarles worked and the pay that he earned, and are clearly business records. However, Quarles did not maintain the exhibit as part of *his* business records; he obtained the document from his aunt. And, although Quarles appeared to have knowledge of how his aunt maintained these particular records, there was no evidence that he had a working knowledge of her general record-keeping system for her business, particularly regarding the creation and retention of business documents. Accordingly, the trial court did not err in ruling that Exhibit 2 was inadmissible as hearsay.

{¶ 42} The trial court also did not err in excluding Exhibit 3. Exhibit 3 was the same as Exhibit 1, but included handwritten dates added by Simpson. Absent Simpson's testifying about them, the dates were hearsay and did not fall under the business record exception.

{¶ 43} Although the trial court should have admitted Exhibit 1, we cannot find that Quarles was prejudiced by the trial court's ruling. Quarles testified about the substance of his exhibits, and his testimony was not stricken. The State cross-examined him extensively about all of the exhibits, and both parties discussed the documents in their

closing arguments. Accordingly, even if the trial court had erred in excluding the documents themselves, the record does not reflect that their exclusion was prejudicial.

{¶ 44} This portion of Quarles's second assignment of error is overruled.

### III. Admissibility of Purported Copies of Court Documents Found in Vehicle

{¶ 45} As part of Quarles's second assignment of error, he also argues that the trial court erred in allowing the State to introduce copies of court documents that were purportedly found in the Tahoe by Officer Herald.

{¶ 46} During Officer's Herald's rebuttal testimony, the prosecutor showed Officer Herald copies of two packets of documents concerning Quarles from the Clark County Municipal Court. Exhibit F consisted of certified copies of documents from the record for Case No. 12TRD12796. The exhibit included the citation for driving under suspension and for expired tags issued to Quarles on October 27, 2012. Also included were pages showing court hearing dates, information about Quarles's arraignment, and the court's sentence.

{¶ 47} Exhibit G appears to be the record of Case No. 13TRD1519, a traffic case in which Quarles was charged with driving under suspension and speeding. The first page of Exhibit G was a judgment entry issued by the municipal court on March 13, 2013, ordering Quarles to appear on April 3, 2013 to show cause why he should not be punished for failure to complete community service; the judgment entry page of Exhibit G related to both Case Nos. 13TRD1519 and 12TRD12796. Unlike Exhibit F, Exhibit G did not contain certified copies of the municipal court records.

{¶ 48} Defense counsel objected to the prosecutor's use of the documents. He argued that Exhibits F and G were not the actual documents located in the Tahoe, and

that he (defense counsel) had never seen the documents found in the vehicle. The prosecutor indicated that the exhibits would impeach Quarles's testimony that he had not driven the Tahoe since he received the ticket on October 27, 2012. The trial court overruled the objection.[1]

{¶ 49} To be admissible, State's Exhibits F and G needed to be relevant. Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. However, even relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A). Decisions regarding the admissibility of evidence at trial are within the broad discretion of the trial court. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 86; *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50.

{¶ 50} During Officer Herald's direct examination, Herald described the documents in the vehicle as follows: "They were Clark County, Ohio court documents, such as like yellow copies of an affidavit, like the defendant's copy that they get served during arrest, and some other court papers." Herald stated that the papers stated Quarles's name, but he did not provide further information about the documents.

---

[1] The record does not indicate that the State moved to admit Exhibits F and G at the conclusion of Herald's rebuttal testimony, but the record reflects they were treated as admitted. The transcript lists them as admitted. Moreover, Defense Exhibits 1-3 and State's Exhibit C, which the court ordered not to be admitted, have a post-it note stapled to them stating that they were not admitted; Exhibits F and G do not have a similar post-it note.

{¶ 51} During Quarles's testimony, Quarles was asked if he recalled the paperwork that may have been left in the Tahoe. Quarles responded, "I believe it was a ticket that I got over in German Township by the mall in October the year before, '12." Quarles further testified that he stopped driving the Tahoe "[w]hen I got the ticket. I got tired of driving with suspensions."

{¶ 52} During cross-examination, the prosecutor asked Quarles if he was supposed to go back to court for the October 2012 traffic ticket. He specifically asked if the case went on until June 2013, whether the court had issued a show cause order on April 3 because he did not appear, and whether Quarles had disregarded the court cases and gone to Colorado. Quarles testified that "[i]t wasn't brought to my attention, probably even slipped my mind about going to court on that day." (Tr. 97) The prosecutor also asked Quarles about getting the October 2012 ticket, and Quarles agreed he was driving the Tahoe when he got the ticket.

{¶ 53} When Officer Herald was called as a rebuttal witness, he repeated that he had observed court papers in the Tahoe on May 2, 2013. After showing Herald Exhibit F, the prosecutor asked the following questions:

Q. Okay. And you heard the defendant's testimony that he had not been back in this car since he got this traffic ticket on October 27, 2012, I believe; is that correct?

A. Correct.

Q. Is it possible that the officer pulled him over, gave him a ticket, and actually gave him the court documents?

A. No, sir.

Q. What does an officer actually give someone when they pull them over for a moving violation?

A. We give them the golden – goldenrod copy of the inside of this that states the charge and the court date and his information.

Q. So when you found this abandoned car at 510 South Huber, it had actual court documents in there; is that correct?

A. Yes, sir.

Q. Okay. So it's not possible that it was just his ticket from October 27th. It had to be documents that he got after that date.

A. Correct.

Q. Thank you. Officer Herald, I'm going to give this to you one more time. I have one more question. Do these court documents indicate dates on which the defendant was supposed to be in court?

A. Yes. They did, but I can't recall the date.

Q. Okay. If you examine that document. Does that indicate in that particular case the defendant was supposed to be in court on April 3rd, 2013?

A. Yes.

**{¶ 54}** The prosecutor then showed Exhibit G to Officer Herald and elicited testimony that Exhibit G concerned another traffic offense that occurred on February 2, 2013. The prosecutor then asked, "Therefore, if the defendant had not been in that vehicle after October 27, 2012, there is no way those court papers could have been in there either." Officer Herald responded, "No."

{¶ 55} On cross-examination, defense counsel asked Herald if he knew when Quarles had been given copies of the court papers found in the Tahoe. Herald said that he did not. Defense counsel asked the officer to look at Exhibit F, and Herald testified that the document mentioned events that occurred as late as June 26, 2013, which was after May 2, 2013. Defense counsel then asked:

Q. Are you telling the jury that the paperwork that you went over that was found in the vehicle had each of those event dates on it, from 3/13 – I think there was a couple days in March, a couple dates in June. Did you look at that part of the paperwork that was found in the vehicle?

A. No, I didn't.

Q. What part of the paperwork did you actually look at?

A. The part that said Anthony Wayne Jackson Quarles, the affidavit.

Q. So as far as you know, that paperwork that you looked at had none of those dates on it.

A. As far as I know.

Q. That's because we don't have that actual paperwork here today.

A. Yes.

{¶ 56} Although Officer Herald testified that court documents related to Quarles's October 27, 2012 traffic offense would have been created and provided to Quarles sometime after October 27, there is nothing in Officer Herald's testimony or in Quarles's testimony to indicate that the court documents in the Tahoe were related to the October 27 (or the subsequent February 2) ticket. Herald repeatedly testified that he looked only at the portion of the ticket affidavit that had Quarles's name and identifying information.

The officer did not indicate the court documents related to the October 27 ticket, and Quarles had indicated that he had had prior driving under suspension traffic cases. In short, there is nothing in the record to support a conclusion that Exhibits F and G were the documents in the Tahoe.

{¶ 57} The actual documents in the Tahoe were not collected, and they were not presented as evidence at the trial. The record does not support a conclusion that Exhibits F and G were the documents in the Tahoe and, thus, we fail to see how they were relevant to the trial. Moreover, because Exhibit G did not contain certified copies, that exhibit was inadmissible as unauthenticated hearsay.

{¶ 58} Finally, we cannot conclude that the admission of Exhibits F and G was harmless. The admission of the exhibits may have led the jury to believe that, although these were not the actual papers found in the Tahoe, they were copies of the documents and, therefore, Quarles must have been lying when he (Quarles) testified that he had not driven the Tahoe since October 2012. The prosecutor argued as much when he said, "[T]he guy left his court papers in there, court papers which couldn't have been in there if he hadn't been in that car since October 27th, so clearly, he's lying to you about that."

{¶ 59} Moreover, the documents contain information about Quarles's conduct during those cases, which had no bearing on the case before the jury and were prejudicial to Quarles. Exhibit F indicated that Quarles had pled guilty to both charges on the traffic ticket, and the record showed his sentence. The exhibit further indicated that there were three orders for bench warrants and a hearing set on a show cause order. The final date for the show cause order was June 26, 2013, which was after the May 2, 2013 offense at issue; thus, this page of Exhibit F could not have been in the Tahoe when it was located

by Officer Herald.

**{¶ 60}** Exhibit G concerned a February 2013 traffic ticket, which Quarles received while driving a different vehicle, not the Tahoe. The traffic offenses referenced in Exhibit G included a speeding offense, which could have led the jury to believe that Quarles was more likely to speed through residential areas on May 2. Exhibit G included information that Quarles had failed to appear in court when ordered in April 2013 and was required to address a contempt charge. Exhibit G indicated Quarles's sentence for the February 2013 ticket. Another page of the exhibit showed that Quarles was arrested on June 13, 2013. The last two pages of Exhibit G appear to be printouts of the municipal court's online case summaries, one of which purportedly indicated that on May 5, 2013, Quarles was involved in another offense while driving the Tahoe (the vehicle information was highlighted).

**{¶ 61}** Both the May 5, 2013 incident and the June 13, 2013 arrest occurred after the May 2, 2013 offense at issue, and it was impossible for the pages regarding these events to be in the Tahoe on May 2, 2013. Quarles was unfairly prejudiced by the implication that these unauthenticated documents were in the Tahoe on May 2. In addition, the reference in an unauthenticated document to Quarles's being involved in another traffic offense with the Tahoe on May 5, 2013 directly contradicted Quarles's testimony that he had not driven the Tahoe since October 27, 2012 and was prejudicial. In summary, based on the information contained in Exhibits F and G, we cannot conclude that the erroneous admission of these exhibits, one of which was unauthenticated, was harmless, i.e., that there was no reasonable probability that the outcome of Quarles's trial would have been different but for the error.

**{¶ 62}** This portion of Quarles's second assignment of error is sustained.

### IV. Stating Reasons for Objection in Open Court

**{¶ 63}** Finally, Quarles raises in his second assignment of error that the trial court erred in allowing the prosecutor to object to Quarles's documentary evidence in front of the jury. Quarles cites to the prosecutor's argument, quoted above, that Exhibits 1-3 were untrustworthy, because they had been altered, they were provided to the State by Quarles after the trial had been continued twice, and the source of the documents was Quarles's aunt, who had no business address and had previously told authorities that she had no records. Quarles argues that the prosecutor did not present any witnesses to support his argument, yet was allowed to make his argument in open court. We infer Quarles's argument to be that the prosecutor engaged in misconduct.

**{¶ 64}** In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor. *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

{¶ 65} We agree with Quarles that the prosecutor's reasons for objecting to Exhibits 1-3 should not have been expressed in front of the jury. Crim.R. 103(C), regarding rulings on evidence in the hearing of a jury, provides, "In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury." As expressed by the Florida Court of Appeals,

> [A]ll trial lawyers know that so-called speaking objections are improper, as they constitute nothing less than unauthorized communications with the jury. Such objections characteristically consist of impermissible editorials or comments, strategically made by * * * lawyers to influence the jury. They are distinguishable from legitimate objections which simply state legal grounds that arguably preclude the introduction of the evidence at issue. Where an objection requires more than a simple statement of such legal grounds, experienced trial lawyers know they need to seek a side bar conference or ask the court to excuse the jury so that more thorough arguments can be made.

*Michaels v. State*, 773 So.2d 1230, 1231 (Fla.Ct.App.2000).

{¶ 66} By stating his reasons in front of the jury, the prosecutor informed the jury, without any evidentiary support, that he believed the documents to be untrustworthy (for a variety of reasons) and that Simpson was not a credible businessperson. The State further commented on the absence of Simpson, a potential witness for Quarles. The trial court did not provide a limiting instruction to the jury to disregard the arguments regarding

Exhibits 1-3. (The court later provided a general instruction during jury instructions that opening and closing arguments of counsel are not evidence, but it did not reference arguments concerning speaking objections.)

{¶ 67} In its brief, the State asserts that Quarles was not prejudiced by the prosecutor's comments, because the prosecutor's objections were followed by arguments of defense counsel in open court, but defense counsel's only choice was to try to un-poison the well. And, because the trial court did not immediately rule on the admissibility of Quarles's exhibits, both parties proceeded to question Quarles about them as if they were admissible. Both parties discussed the documents and Simpson in their closing arguments.

{¶ 68} Although the prosecutor was wrong to make a speaking objection to Quarles's exhibits and the trial court erred in allowing such an objection to occur in front of the jury, we need not decide whether such conduct affected Quarles's substantial rights. Having concluded that this matter must be reversed due to the admission of State's Exhibits F and G, this issue is moot.

{¶ 69} Quarles's second assignment of error is sustained in part and overruled in part.

### V. Conclusion

{¶ 70} The trial court's judgment will be reversed, and the matter will be remanded for further proceedings.

. . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Ryan A. Saunders
Hilary Lerman
Hon. Douglas M. Rastatter