[Cite as *State v. Wood*, 2016-Ohio-1102.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26634 |
| | : | |
| v. | : | T.C. NO. 14TRD7805 |
| | : | |
| ISAIAH D. WOOD | : | (Criminal appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ____18th____ day of ____March____, 2016.

. . . . . . . . . . .

AMY B. MUSTO, Atty, Reg. No. 0071514, Assistant City Prosecutor, 335 W. Third Street, Rm. 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

SCOTT A. ASHELMAN, Atty. Reg. No. 0074325, P. O. Box 752345, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

**{¶ 1}**  This matter is before the Court on the Notice of Appeal of Isaiah Wood, filed March 24, 2015. On March 9, 2015, Wood was found guilty, following a bench trial in Dayton Municipal Court, of failure to stop after an accident, in violation of R.C. 4549.02(A), a misdemeanor of the first degree; driving under financial responsibility law suspension,

in violation of R.C. 4510.16(A), an unclassified misdemeanor; and failure to maintain an assured clear distance ahead, in violation of Section 71.50 of the City of Dayton Revised Code of General Ordinances, a minor misdemeanor. For failure to stop after an accident, Wood was sentenced to 180 days that were suspended, 250 hours of community service, a $200.00 fine, and one year of non-reporting community control; on the R.C. 4510.16(A) violation, Wood was fined $200.00, which the court suspended; for failure to maintain an assured clear distance ahead, Wood was fined $150.00, which the court also suspended. Wood argues that his convictions were not supported by sufficient evidence and are against the manifest weight of the evidence. We hereby affirm the judgment of the trial court.

{¶ 2} At trial, the victim herein, Carrie Fields, testified as follows regarding the events of June 4, 2014 that gave rise to this matter:

I was driving, going towards Salem Avenue. It's construction going on by the bridge on Salem, so I was in the turning lane going to the left and, all of a sudden, a black car with tinted windows rammed the back of my bumper on my car. As I looked in my mirror, I see that this car was going around me, into oncoming traffic, down Salem to Plymouth. So I started chasing this black car to Plymouth, down Central, and blowing my horn saying he hit my car. He hit my car. Call the police. Then we got down to the end of Central and Riverview, that's when we interact with the police officer. And he ran every stop sign.

{¶ 3} Fields testified that the vehicle that struck hers was a Black Ford Crown Victoria, and that she never lost sight of the vehicle while pursuing it. She stated that the

vehicle had tinted windows, but that she was able to discern that the driver was a black male, and that no one else was in the vehicle. Fields stated that her rear bumper sustained damage, and that she made a report to the police.

{¶ 4} John Howard testified that he is a City of Dayton police officer assigned to the Special Investigations Division. He stated that on June 4, 2014, around 11:00 a.m., he was in a marked cruiser, crossing the Monument Street Bridge and turning left onto West Riverview Avenue, when he observed a black Ford Crown Victoria passing a vehicle stopped at a stop sign on Central Avenue. According to Howard, the black Ford passed the stopped vehicle between its passenger side and the stop sign, driving "on the curb and the grassy area as it passed and ran a stop sign coming out onto West Riverview." Howard testified that the Ford was 15 to 25 feet "off my right front bumper off the passenger side." Howard stated that he had a clear view of the vehicle. He testified as follows:

Once, when the vehicle * * * ran the stop sign and was out onto West Riverview in front of me, I advised dispatch of the plate. Activated my overhead emergency equipment for the vehicle to stop. The vehicle fled, crossing Salem Avenue continuing onto West Riverview onto Edwin C. Moses and then turning onto West Riverview. As I advised dispatch of the plate, I was able to enter this plate into my KDT. After I stopped, because of the no pursuit policy we have, I was able to read the FIC's[1] associated with this plate. During me reading these FIC's I noted that there was an FIC that listed three people that routinely drive this vehicle. I then

_____

[1] Field Interview Card

accessed Justice Web and the first picture I pulled up from the Social Security Number that was provided from this FIC, was the Defendant.

**{¶ 5}** Howard identified a copy of the FIC printout and the JusticeWeb photograph of Wood that he obtained after running the plates of the vehicle on June 4, 2014.   When asked how certain he is that the driver of the Crown Victoria on the date of the incident is the same person depicted in the JusticeWeb photograph, Howard responded, "Without a doubt in a my mind." Howard testified that he learned that Wood was under a "non-compliance" suspension, and that the vehicle "came back to 151 Lexington." Howard identified Wood's certified Ohio Bureau of Motor Vehicles record.

**{¶ 6}** Howard testified that he met with Fields, obtained her report, and requested that dispatch send a crew to the Lexington Avenue address.   Howard stated that he subsequently learned, via radio, that the vehicle had been located in the area of the Lexington Avenue address, and that he proceeded there and identified the vehicle. Howard testified that he observed "very minor front end damage" to the vehicle, that he had observed "minor rear end damage" to Fields' car, and that the damage to the vehicles in his experience was consistent with a rear end accident. Howard testified that he arranged for the Ford to be towed from the roadway. While on the scene, Howard stated that a "resident came out of 144 Lexington with a delivery repairman.   The repairman told me that hey that's her vehicle and I made contact with the registered owner of the vehicle."

**{¶ 7}**   On cross-examination, Howard testified that when he observed Wood run the stop sign, based upon his experience, Wood was travelling at a speed of 15 miles an hour. Howard testified that the vehicle did not have tinted windows.   He testified that his

view was unobstructed, and that he was able to see Wood clearly. Howard stated that he observed a "little" beard on Wood. He testified that he had not had prior contact with Wood, and that he did not have contact with him on the date of the incident. On re-direct examination, Howard testified that he is "a hundred percent sure" that Wood drove the Crown Victoria on the date of its collision with Fields' vehicle.

{¶ 8} Evelyn Wood testified that she owns a 1998 Ford Crown Victoria, and that Isaiah Wood is her son. She stated that on June 4, 2014, her niece was residing in her home, and her nephew, John Camp, was also visiting her for a "couple days." Evelyn stated that she keeps the key to her car on a key ring on a "key hanger" by the front door of her home, and that there is only one master key to the vehicle. Evelyn stated that on the date of the incident, the police came to her home and told her that her vehicle "was involved in a hit and run." She testified that the officer "told me that they were looking for Isaiah. And I said Isaiah is not here. He's at home" in Trotwood. Evelyn stated that her vehicle was at her home when the police arrived. Evelyn testified that Isaiah had not been to her home on the day of the incident and accordingly could not have had access to the key to the Crown Victoria. Evelyn stated that she has not seen her nephew since the incident, and that he currently lives in Atlanta. On cross-examination, Evelyn stated that she has allowed Isaiah to drive her vehicle on past occasions. She testified that she has no personal knowledge regarding who was driving her vehicle on June 4, 2014.

{¶ 9} Isaiah Wood testified that on the morning of June 4, 2014, he and his girlfriend "took the kids to daycare," and that afterwards, they went home "and had breakfast and I was at home, in Trotwood, at 8032 Bell Creek Lane. Just relaxing, watching t.v. and playing a videogame." Isaiah testified that he was aware that his

cousin, John Camp, was visiting from Atlanta, and that he did not see him on the day of the collision. Isaiah stated that Evelyn does not have any spare keys to her vehicle. According to Isaiah, he "wouldn't ever have to use her car. I have (sic) my own vehicle at that time. I had a 2006 Pontiac Grand Prix." He stated that he drove Evelyn's vehicle "a long time ago. Maybe if my car was in the shop, getting some work done. Maybe." Isaiah stated that if he ever intended to use Evelyn's vehicle, he would have to obtain the key from her. Isaiah denied being at Evelyn's home on June 4, 2014, having access to the key to her vehicle, and driving her vehicle on that date.

{¶ 10} Isaiah asserts one assignment of error herein as follows:

THE TRIAL COURT DETERMINED APPELLANT'S GUILT BEYOND A REASONABLE DOUBT DESPITE SUCH A DETERMINATION BEING BASED ON INSUFFICENT EVIDENNCE TO SUSTAIN THE CONVICTION, AND SAID CONVICTION BEING AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

{¶ 11} Regarding the sufficiency of the evidence, Isaiah asserts that in "this case there was no video surveillance to review in an objective fashion, nor was Officer Howard in making what can only be described as a snap identification, familiar in any way with Appellant to lend additional or special veracity to his identification." According to Isaiah, "there was not an opportunity for Officer Howard to calmly and at length observe Appellant, nor was there an opportunity to definitively tie him to the vehicle involved in the collision outside of the brief observation at the moment of a near collision." Isaiah asserts that Howard's testimony "is directly contradicted as to the very basic fact that the vehicle had window tint obscuring the occupant(s) from other than the most basic

description by an independent witness." In a footnote, Isaiah argues that it "is unfortunate and perhaps telling that the prosecution failed to clarify the matter of the window tint when the opportunity to cross-examine the vehicle's owner arose."

{¶ 12} Regarding the manifest weight of the evidence, Isaiah asserts as follows:

The only evidence tying Appellant to the collision with Fields is Ofc. Howard's testimony identifying Appellant as the driver that left the scene. The officer's testimony is factually contradicted by Fields [regarding the window tint]. It is also called into question by the testimony of Ms. Wood, the vehicle's owner, and Appellant's own testimony. There is nothing in the record that suggests that any of the witnesses were less than credible when they testified. Therefore, when the full spectrum of the evidence introduced at trial is considered, it is clear that the verdict of guilty was made against the manifest weight of the evidence

{¶ 13} The State responds that Evelyn testified that she has allowed Isaiah to drive the vehicle on past occasions, and that "[t]his gives the Appellant a strong association with this vehicle. The identification of the vehicle involved was not disputed by any party and the vehicle was identified by Ms. Fields as the car that rear ended her vehicle." The state asserts that Howard was in close proximity to the vehicle and testified that "the window he was looking through was not tinted and that he was 100% certain that the Appellant was the one driving the vehicle. * * * He reviewed a photo of the Appellant immediately after he observed him driving and identified him via the photograph as well." The State notes that while Evelyn "attempted to bolster" Isaiah's testimony that he was not driving the vehicle at the time of the collision, "upon cross-examination she was forced

to admit that she had no knowledge as to who was driving the vehicle on June 4th. * * * The Appellant is essentially arguing that the trial court should have believed his witness instead of" the State's witnesses.

{¶ 14}  As this Court has previously noted:

When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist. 2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State*

*v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Consequently, a judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510 (Oct. 24, 1997).

*State v. Griffith*, 2015–Ohio–4112, 43 N.E.3d 821, ¶ 26–28 (2d Dist.). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. * * *." *State v. Quarles*, 2015-Ohio-3050, 35 N.E.3d

616, ¶ 5 (2d Dist.) Finally, " '[e]very criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. * * * Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence' * * *". *Id.,* ¶ 23.

**{¶ 15}** R.C. 4549.02(A) provides in part as follows:

In case of accident to or collision with persons or property upon any of the public roads or highways, due to the driving or operation thereon of any motor vehicle, the person driving or operating the motor vehicle, having knowledge of the accident or collision, immediately shall stop the driver's or operator's motor vehicle at the scene of the accident or collision and shall remain at the scene of the accident or collision until the driver or operator has given the driver's or operator's name and address and, if the driver or operator is not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to any person injured in the accident or collision or to the operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision, or to any police officer at the scene of the accident or collision.

**{¶ 16}** R.C. 4510.16(A) provides in part: "No person, whose driver's or commercial driver's license or temporary instruction permit or nonresident's operating privilege has been suspended or canceled pursuant to Chapter 4509. of the Revised Code, shall operate any motor vehicle within this state * * *." Section 71.50 of the City of Dayton Revised Code of General Ordinances provides:

No person shall operate a motor vehicle * *  at a speed greater or

less than is reasonable or proper, having due regard to the traffic, surface, and width of the street or highway and any other conditions, and no person shall drive any motor vehicle * * * in and on any street or highway at a greater speed than will permit him to bring it to a stop within the assured clear distance ahead.

{¶ 17} Having thoroughly reviewed the entire record, we conclude that the testimony of Howard and Fields was sufficient to convict Isaiah of the charged offenses beyond a reasonable doubt, and that his conviction is not against the manifest weight of the evidence. The State provided evidence that Isaiah was associated with the Crown Victoria; it belonged to his mother and Isaiah had driven it in the past. Fields testified that she observed a black male driving the vehicle that struck hers. Howard testified that he observed the Crown Victoria, in daylight hours, from a distance of 15 to 25 feet, pass Fields' vehicle and run a stop sign as it turned onto Riverview Avenue. Howard stated that he had a clear view of the vehicle and the driver through untinted windows, and he noted that Isaiah had a small beard. Immediately thereafter, Howard stated that he retrieved a photograph from JusticeWeb of Isaiah after running the vehicle's license plate on his computer in the cruiser. From that photograph, Howard identified Isaiah as the driver of the Crown Victoria whom he had just observed. We note that while Isaiah asserts that "the prosecutor failed to clarify the matter of the window tint" in the course of Evelyn's cross-examination, there was no evidence adduced that the tint prevented a reliable identification. Howard testified that he was "a hundred percent sure" of Isaiah's identity as the driver who collided with Fields. Howard testified that Isaiah's license was suspended. Howard stated that the rear end damage to the Crown Victoria was consistent

with a rear end collision in his experience. While Isaiah testified that he was at home in Trotwood at the time of the accident, and Evelyn testified that Isaiah had not been to her home that day, the trial court was free to reject Isaiah's alibi and credit Howard's testimony, and we defer to the trial court's assessment of credibility.

**{¶ 18}** After viewing the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the essential elements of the charged offenses proven beyond a reasonable doubt, and that this is not an exceptional case in which the evidence weighs heavily against the convictions. Since Isaiah's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence, his assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Amy B. Musto
Scott A. Ashelman
Hon. Carl Sims Henderson